UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| KERI WOMACK, individually, on behalf of all wrongful death beneficiaries, and as the heir and representative of the Estate of SAWYER LETCHER § § § § § § | | |
| Plaintiff § § | | |
| v. § § | Civil Action No. 3:19-cv-000001 | |
| UNIVERSITY OF TEXAS MEDICAL BRANCH and TEXAS DEPARTMENT OF CRIMINAL JUSTICE § § § § § | | |
| Defendants § § | | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Keri Womack, individually and in her capacity as the administrator of the Estate of Sawyer Letcher, brings this suit for herself and on behalf of all wrongful death beneficiaries against the Texas Department of Criminal Justice and University of Texas Medical Branch, seeking redress for the suicide death of her beloved teenage son, and would show the following:

### I.   PARTIES

*A. Plaintiff*

1)   Plaintiff Keri Womack is the natural mother of the decedent, her beloved son, Sawyer Letcher. Ms. Womack resides in San Angelo, Texas.

2)   Ms. Womack sues in her individual capacity, as statutory beneficiary under the Texas Wrongful Death Act, on behalf of any other statutory beneficiaries, and as the administrator of the Estate of Sawyer Letcher, of which she is an heir-at-law.

    3)       Sawyer had no surviving spouse, and no surviving children.

    4)       Sawyer died intestate. An application to probate his estate and appoint Ms. Womack as administrator is pending in Tom Green County, where Sawyer resided before his incarceration.

    *B. Defendants*

    5)       Defendant Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. At all relevant times, it operated the Hodge Unit, a public facility with programs and services for which Sawyer was otherwise qualified. TDCJ is a recipient of federal funds. TDCJ can be served with process through its executive director, Bryan Collier, at 861-B I-45 N., Huntsville, TX 77320.

    6)       The University of Texas Medical Branch is a component of the University of Texas system that provides medical and psychiatric care to TDCJ prisoners pursuant to a contract with TDCJ, including at the Hodge Unit. UTMB is a recipient of federal funds. UTMB can be served with process through its President, David L. Callendar, at 301 University Blvd., Administration Building, Galveston, TX 77555-1006.

## II.    Jurisdiction

    7)       This case is brought pursuant to Title II of the Americans with Disabilities Act (42 U.S.C. § 12131, etc. seq.) and the Rehabilitation Act (29 U.S.C. § 794). Thus, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

    8)       This Court has general personal jurisdiction over the Defendants as they operate in the Southern District of Texas, and both agencies are headquartered in the

Southern District of Texas. Thus, the Court has personal jurisdiction under 28 U.S.C. § 1391(c).

### III. VENUE

9) Venue is proper in the Southern District of Texas, Galveston Division.

10) UTMB has its headquarters within the Galveston Division, and TDCJ's headquarters is within the Southern District.

11) UTMB's headquarters is located in Galveston, Texas. UTMB's policymaking officials, who will have relevant knowledge in this case, reside and work within the Galveston Division.

12) TDCJ's headquarters is located in Huntsville, Texas. TDCJ's policymaking officials, who have relevant knowledge in this case, reside and work within the Southern District.

13) Because Sawyer is deceased, all relevant medical records are located in TDCJ and UTMB's archives, which are within the Southern District of Texas.

14) Sawyer was frequently treated by UTMB psychiatric providers who reside and work in the Southern District of Texas.

### III. FACTUAL BACKGROUND

15) Plaintiff's beloved son, Sawyer Letcher, age 19, died of suicide in Defendants' custody and care when TDCJ and UTMB failed to accommodate his serious mental disabilities.

16) From a very young age, it was obvious Sawyer suffered from severe developmental disabilities and mental illnesses, meaning he would always have no more than a child-like ability to function.

17) When he was in the eighth grade, Sawyer was committed to the Texas juvenile prison system, where he was imprisoned in Texas' special juvenile prison for children with severe mental illnesses. Sawyer was subsequently transferred to the adult prison system, and the TDCJ Hodge Unit because of his obvious mental disabilities.

18) TDCJ and UTMB knew about Sawyer's lifelong struggle with serious mental illnesses immediately after he arrived in their custody and care. The day after Sawyer arrived in TDCJ custody, he told UTMB medical providers that he "felt suicidal." While in TDCJ custody, UTMB diagnosed Sawyer with bipolar disorder, impulse control disorder, and borderline intellectual functioning and treated him following multiple self-harm incidents (including multiple suicide attempts).

19) Sawyer regularly experienced vivid and frightening hallucinations – seeing and hearing things that were not there. Sawyer would see "shadows" passing by his cell, and hear voices telling him to harm himself – so he would bang his head on the wall to try and make the voices stop.

20) UTMB prescribed Sawyer several powerful antipsychotic medications to treat schizophrenia, bipolar disorder, and depression. Unfortunately his mental illness affected Sawyer's ability to take his medication. Sawyer's paranoia made him believe "the Doctor and nurses were attempting to sabotage him" by prescribing him medication.

21) Sawyer's UTMB doctors expressly noted his condition was severe.

22) Sawyer's mental disabilities substantially disrupted his ability to think, care for himself, and sleep. He complained to UTMB psychiatric providers about "days of insomnia," "racing thoughts," "restlessness," and "irritability." UTMB psychiatric

providers noted his mood was "depressed and irritable," and that he suffered from extreme "paranoia." UTMB nurses regularly observed Sawyer talking to himself.

23) Sawyer even told his UTMB psychiatrist "I'm not ok, doc."

24) UTMB psychiatric providers often noted Sawyer's appearance was "disheveled and disorganized," and his hygiene was "poor," demonstrating an inability to care for himself.

25) While in TDCJ's outpatient prisons, Sawyer engaged in bizarre behaviors, like eating his own feces and drinking his own urine. On one occasion, Sawyer cut open his arm in an openly suicidal fashion and told the counselor who saw him that "it makes him feel good to feel the blood running down."

26) As a consequence of Sawyer's severe mental disabilities, he was unable to "work" in any of the forced labor "jobs" that able-bodied prisoners are regularly required to perform. Thus, Sawyer's disabilities substantially limited his ability to "work."

27) Because of Sawyer's profound mental illnesses, UTMB and TDCJ enrolled him in the "Developmental Disabilities Program" (DDP), an outpatient program and service for patients with severe mental illnesses or intellectual impairments located at the Hodge Unit. Though DDP is only offered in an outpatient setting, it is designed to help prisoners with intellectual impairments and severe mental illnesses adjust to prison life and learn life skills.

28) Even when he was enrolled in the DDP, however, Sawyer knew it was inadequate to address his serious mental health problems. He asked UTMB to permanently admit him to an inpatient program so he could receive the "intense therapy" he required. UTMB denied his request.

29) Before his death, Sawyer had harmed himself multiple times in TDCJ custody by banging his head against the wall until his forehead would split open, cutting his own wrists, and trying to hang himself. UTMB psychiatric providers recorded that Sawyer would laugh manically and say "I'm gonna cut. I'm not gonna take my meds," and on another occasion that "I tr[ied] to kill myself, I tried to break my neck" by running headfirst into a wall.

30) TDCJ and UTMB first became aware Sawyer was at risk of suicide in May 2015, two years before his death. After multiple documented suicide attempts, UTMB psychiatric providers would record in his record "PATIENT REMAINS A THREAT TO HIS SAFETY."

31) Twice in the eighteen months before his death, Sawyer was hospitalized after officers found him "hanging by his sheets in his cell."

32) UTMB medical and psychiatric providers had, on multiple occasions, even authorized placing Sawyer in "five point" restraints – strapping his extremities to a chair and placing a helmet on his head – to prevent him from harming himself.

33) On multiple occasions in both inpatient and outpatient facilities, UTMB providers ordered TDCJ custody staff to not issue Sawyer bedding material (such as sheets and towels), sharp objects (like shaving razors, pencils, or pens), and utensils (like a fork) that are typically provided to prisoners because the UTMB providers believed it was highly likely Sawyer might use these materials to harm himself.

34) Instead of permanently assigning Sawyer to an inpatient treatment facility, however, UTMB medical and psychiatric providers chose to cycle Sawyer through the "crisis management" program when his psychiatric symptoms resulted in more suicide

attempts or thoughts of harming himself as he decompensated after return to the outpatient facilities and again became a "danger to himself." "Crisis management" is a short-term, intense inpatient treatment program for patients acutely suffering from suicidal thoughts and tendencies.

35) As a result, Sawyer was admitted to TDCJ and UTMB's inpatient psychiatric treatment facilities for "crisis management" numerous times. While this accommodation temporarily prevented him from actually committing suicide, it did nothing to help him on an ongoing basis. Sawyer typically did very well in the inpatient setting, with nurses noting significant improvement just a few days after each arrival. UTMB and TDCJ, however, chose not to permanently treat Sawyer in the inpatient setting. The last time he was discharged from an inpatient facility, just two months before his death, Sawyer warned the counselor who discharged him that he "would be back."

36) At approximately 10:00 pm on May 24, 2017, Sawyer once again attempted to harm himself by overdosing on medication – he swallowed seven Benadryl, a tube of ointment prescribed for an abscess his arm, and two-and-a-half weeks worth of antidepressant medication. TDCJ and UTMB staff took him to the local emergency room where he was successfully treated for the overdose.

37) The next afternoon, May 25, 2017, Sawyer returned to the Hodge Unit, and was not personally seen by a doctor. Rather, he was only seen by a nurse. The nurse consulted with her supervising physician. Instead of placing Sawyer in an inpatient facility, they again referred Sawyer to "crisis management," even though no crisis management beds were available for him. In Sawyer's chart, the UTMB nurse wrote "**Please schedule with Hodge Psych Provider asap.**"

38) But there were no "crisis management beds available at this time," according to Sawyer's medical records, and Sawyer never saw a UTMB "psych provider."

39) Admission to "crisis management" or an evaluation by a psychiatric provider were minimum reasonable accommodations for Sawyer's disabilities that UTMB denied Sawyer.

40) Instead, the UTMB nurse told TDCJ custody staff that Sawyer was actively suicidal, and needed to be placed on "constant and direct observation" status, where an officer would be assigned to constantly watch Sawyer around the clock until a "crisis management" bed became available (or a psychiatric provider ended the "constant and direct observation"). A prisoner on "constant and direct observation" is not allowed to have a standard blanket, sheets, or sharp objects.

41) TDCJ staff, however, ignored the requests from UTMB. TDCJ officers did not confiscate his bedding, and even placed him in a single-person cell with cell bars that could be used as a tie-off point for a ligature, actually increasing the risk of successful suicide.

42) Upon information and belief, TDCJ officers also did not place Sawyer under "constant and direct observation" until he could see a psychiatric provider, despite the medical order.

43) In the alternative, UTMB staff never communicated the necessity of "constant direct observation" to the TDCJ staff responsible for actually supervising Sawyer. If true, this also denied Sawyer a reasonable accommodation.

44) "Constant direct observation," confiscation of bedding, and housing in a cell without "tie-off points" were all reasonable accommodations that TDCJ knew Sawyer needed (assuming UTMB staff informed them). Despite this, TDCJ (or, in the alternative, UTMB) denied Sawyer these accommodations.

45) As a result of TDCJ and UTMB's failures to reasonably accommodate Sawyer's mental disabilities, officers found him hanging "by the neck from a bedsheet tied to the bars of the cell window" shortly after noon on May 26, 2017.

46) Sawyer was pronounced dead approximately one hour later at the local hospital.

47) Had TDCJ and UTMB reasonably accommodated Sawyer's disabilities, he would have likely completed his remaining prison term and returned home to live with his mother, the Plaintiff, in just a few short years.

### IV. CAUSES OF ACTION: AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT

48) Title II of the Americans with Disabilities Act and the Rehabilitation Act require public entities to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

49) Failure to provide reasonable accommodations is illegal discrimination under the Acts, entitling a plaintiff to compensatory damages.

50) The Rehabilitation Act also requires federal funds recipients to reasonably accommodate persons with disabilities in their programs and services. Both TDCJ and UTMB are recipients of federal funds.

51) The Hodge Unit is a facility, and its operation comprises a program and service, for Rehabilitation Act and ADA purposes.

52) The incarceration, safe housing, the DDP, "crisis management," inpatient psychiatric care, and "constant and direct observation," among other things, are programs and services TDCJ and UTMB provided to people.

53) Sawyer was a qualified individual with a disability under the meaning of both the ADA and the Rehabilitation Act. Sawyer had a mental impairment that substantially limited one or more of his major life activities, or the operation of one or more of his major bodily systems. Specifically, Sawyer's mental illnesses impaired the operation of his brain, and substantially limited his ability to think, sleep, communicate, and care for himself, as described above. *See* 42 U.S.C. § 12102(1)-(2).

54) Both TDCJ and UTMB knew Sawyer was a qualified individual with a disability. Both TDCJ and UTMB knew Sawyer's mental illnesses had resulted in multiple prior suicide attempts while in their custody and care, and that his continued incarceration required reasonable accommodations.

55) Despite this knowledge, TDCJ and UTMB intentionally discriminated against Sawyer by denying him reasonable accommodations for his serious mental illness.

56) TDCJ denied Sawyer the reasonable accommodations of:

    i. "constant direct observation" when he was known to be acutely suicidal and awaiting admission to an inpatient psychiatric facility;

    ii. confiscation of his bedding and other materials that could be used to make a ligature;

    iii. assignment to a multi-person cell, where a cellmate could alert officers that Sawyer was beginning to hang himself; and,

      iv.    assignment to a cell without "tie-off points," like the bars on the cell window which Sawyer used to hang the ligature from.

57) UTMB denied Sawyer the reasonable accommodations of:

      i.    permanent admission to an inpatient psychiatric facility; and,

      ii.    emergency admission to "crisis management" when UTMB providers determined Sawyer needed immediate, temporary inpatient care.

58) In the alternative, if UTMB did not inform TDCJ about Sawyer's emergent condition and need for reasonable accommodations on May 25, 2017, then UTMB also denied Sawyer the reasonable accommodation of instructing TDCJ to safely house Sawyer and provide "constant and direct observation."

59) In either case, TDCJ is also liable for UTMB's failures to accommodate Sawyer as TDCJ contracts with UTMB to provide medical and psychiatric care to TDCJ inmates. This contract was entered into by policymakers who reside in Galveston for UTMB, and Huntsville or Conroe for TDCJ, both of which are within the Southern District of Texas.

60) Thus, as alleged above, TDCJ and UTMB failed and refused to reasonably accommodate Sawyer's mental disability while he was in custody, and denied him access to programs and services TDCJ and UTMB offered to otherwise qualified individuals. For example, TDCJ and UTMB denied Sawyer access to the DDP, "crisis management," "constant and direct observation," and generally denied him safe housing in TDCJ facilities while he was incarcerated, causing him to suffer more pain and punishment than able-bodied prisoners.

61) TDCJ and UTMB's failures to accommodate Sawyer proximately caused his death.

62) As Sawyer died as a result of TDCJ and UTMB's intentional discrimination against him, Plaintiff is entitled to compensatory damages in the maximum amounts allowed by law under the Texas Wrongful Death Act and Texas Survival Act. TEX. CIV. PRAC. & REM. CODE Chp. 71.

### V. DAMAGES AND ATTORNEYS' FEES

63) Plaintiff is entitled to compensatory damages in the maximum amounts allowed by law.

64) The actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to the Plaintiff and were the moving force of Sawyer's wrongful death, Plaintiff asserts claims for compensatory damages under the ADA and the Rehabilitation Act.

65) Plaintiff, in her capacity as administrator and heir-at-law of the Estate of Sawyer Letcher, asserts a survival claim on behalf of the estate. The Estate has incurred damages including, but not limited to, the following:

    i. Conscious pain and mental anguish; and,

    ii. Funeral and burial expenses.

66) Plaintiff, in her capacity as a wrongful death beneficiary, asserts a claim on her own behalf and for all wrongful death beneficiaries. Plaintiff and all other wrongful death beneficiaries have incurred damages including, but not limited to, the following:

    i. Past and future mental anguish;

  ii. Past and future loss of companionship and society;

  iii. Past and future medical expenses; and,

  iv. Past and future pecuniary loss, including lost of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value.

67) Plaintiff, for herself, all wrongful death beneficiaries, and the Estate, is also entitled to recover attorneys' fees and expenses (including expert expenses) pursuant to the ADA and Rehabilitation Act (42 U.S.C. § 12205 and 29 U.S.C. § 794a), and as otherwise allowed by law.

## VI.   JURY DEMAND

68) Plaintiff respectfully demands a jury trial on all factual issues in dispute.

## VII.   PRAYER FOR RELIEF

69) Plaintiff hereby asks that Defendants be cited to appear and answer and that the Court:

  i. Award Plaintiff, for herself, on behalf of the Estate, and on behalf of all wrongful death beneficiaries, compensatory damages against Defendants in the largest amount allowed by law;

  ii. Find that Plaintiff is the prevailing party in this case and award her attorneys' fees, court costs, and litigation expenses (including expert expenses);

  iii. Award Plaintiff pre-judgment interest and post-judgment interest at the highest rate allowable under the law; and,

    iv.    Grant all other relief in equity or in law, to which Plaintiff may be entitled.

Respectfully submitted,

**EDWARDS LAW**
1101 East 11th Street
Tel.  512-623-7727
Fax.  512-623-7729

By___/s/ Jeff Edwards_____
JEFF EDWARDS
State Bar No. 24014406
jeff@edwards-law.com
SCOTT MEDLOCK
State Bar No. 24044783
scott@edwards-law.com

**ATTORNEYS FOR PLAINTIFF**